UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

KATHLEEN M. WOOD,

                                   Petitioner,

      vs.

                                             9:04-CV-143

ELAINE LORD, Sup't Bedford             (J. Kahn)
Hills Correctional Facility,

                                  Respondent.

_____

APPEARANCES                      OF COUNSEL

RICHARD L. MOTT, ESQ.
Attorney for Petitioner

ELIOT SPITZER                    MICHAEL P. KING
Attorney General of the            Asst. Attorney General
State of New York

GUSTAVE J. DI BIANCO, Magistrate Judge

## REPORT-RECOMMENDATION

     This matter has been referred to me for Report and Recommendation by the

Honorable Lawrence E. Kahn, United States District Judge, pursuant to 28 U.S.C. §

636(b) and Local Rules N.D.N.Y. 72.3(c).

     Petitioner brings this action for writ of habeas corpus pursuant to 28 U.S.C.

§ 2254, challenging a judgment of conviction rendered in the Montgomery County

Court on March 6, 2000. Petitioner was convicted by a jury of Burglary, Second

Degree; Arson, Third Degree; Assault, Second Degree; and Criminal Mischief,

Second Degree.  She was sentenced to incarceration for concurrent terms of 8 years for the Burglary conviction; 3 to 9 years for the Arson conviction; 5 years for the Assault conviction; and 2 to 6 years for the Criminal Mischief conviction.

Petitioner moved to set aside the verdict pursuant to N.Y. CRIM. PROC. LAW § 330.30(1).  On December 14, 2001, Hon. Felix J. Catena, Montgomery County Court Judge, denied petitioner's motion. (Respondent's Ex. C).  Petitioner then filed a direct appeal of her conviction.  On November 27, 2002, the Appellate Division, Third Department affirmed petitioner's conviction, and the New York Court of Appeals denied leave to appeal on February 27, 2003. *People v. Wood*, 299 A.D.2d 739, 751 N.Y.S.2d 106 (3d Dep't 2002), *lv. to appeal denied*, 99 N.Y.2d 621, 757 N.Y.S.2d 833, 787 N.E.2d 1189 (2003).

Petitioner raises six grounds in support of her petition:

1.   The trial court judge improperly refused to give a supplemental jury instruction explaining the difference between accomplice liability and liability for being an "accessory after-the-fact."

2.   The trial court judge improperly allowed the admission of an audio-tape of a conversation between petitioner and her accomplice in violation of petitioner's right to privacy and due process rights.

3.   The evidence at trial was insufficient to convict petitioner of any of the four crimes of which she was found guilty.

4.   Accomplice testimony was improperly admitted into evidence in violation of petitioner's right to due process.

5.      The prosecutor committed misconduct during summation in violation of petitioner's right to due process.

6.      The aggregate of the five grounds above denied petitioner her rights to privacy, a fair trial, and to be convicted with proof beyond a reasonable doubt.

Respondent has filed her opposition to the petition, together with the pertinent state court records and a memorandum of law. (Dkt. Nos. 7, 10-13).  For the following reasons, although I disagree with some of the respondent's arguments, I find that the petition should be denied and dismissed.

## DISCUSSION

## 1.    Facts

The conviction in this case arose from an incident that occurred in the early morning hours of April 16, 2000, in which the petitioner and her then-boyfriend, Steve Kennerknecht decided that Kennerknecht would set fire to Chris Tylutki's trailer. Chris Tylutki testified that at approximately 9:30 p.m. on April 15, 2000, he and a friend of his, James Squillace went to the Sundowner Bar. Trial Transcript (T) at 354-57.  While Tylutki and Squillace were at the Sundowner, petitioner, Steve Kennerknecht, and Patricia Ott arrived. (T. 359)  Tylutki testified that petitioner looked "mad" and made a comment about Tylutki's striped shirt, stating that it looked like he should be in prison. (T. 360-61).  Tylutki stated that the petitioner was at the

3

bar the entire time that Tylutki and Squillace were there, but that Kennerknecht left for a while. (T. 361-62).

Tylutki then stated that later, Squillace drove Tylutki home, and when Tylutki attempted to open the door of his trailer, he was "sucked in", and the trailer blew up. (T. 364).  The trailer was in flames. (T. 365).  He was blown to his knees, he turned around and crawled back to the door of the trailer and down the porch steps. (T. 364). A neighbor ultimately called 911, and Tylutki stated that he stood looking at his home from the outside. (T. 365).  He sustained serious burns and damage to his lungs from the heat. (T. 367).

Tylutki also testified that petitioner and Kennerknecht were the first ones the Tylutki recalled arriving at the scene. (T. 365).  Petitioner ran over to assist Tylutki, but Kennerknecht stood in front of the house looking at it. (T. 366).  On cross-examination, Tylutki testified that he had known petitioner all his life, and that although he dated petitioner at one time, he denied ever raping her. (T. 375).  He testified that after the fire, petitioner helped him with chores and purchasing groceries. (T. 377-78 (direct examination), 389-90(cross-examination).  Tylutki stated that after the fire, petitioner also helped Tylutki's brother who had throat cancer. (T. 377-79).

Tylutki testified that petitioner had Tylutki arrested at one time in connection with an incident involving petitioner's son Robby Wood. (T. 380).  Tylutki testified

4

that this incident occurred *after* the fire and involved an allegation that he served alcohol to the 13 year old Robby Wood. (T. 381).  Tylutki also testified that he had an argument with Kennerknecht in the restroom of the Sundowner Bar on the night of the fire. (T. 383).  Tylutki stated that the bartender came into the restroom, Tylutki walked around him, and walked out of the restroom because Tylutki was intoxicated and "in no shape to fight." (T. 383).

Petitioner's accomplice, Steve Kennerknecht also testified for the prosecution. Kennerknecht actually set the fire and pled guilty to the charges, receiving a sentence of 15 years incarceration. (T. 404).  He testified that he was petitioner's boyfriend for approximately three years and had an old "legal" problem about which he told petitioner. (T. 406).  Kennerknecht stated that petitioner told him that she would turn the information over to the police, so Kennerknecht agreed to "do things" for petitioner.

Kennerknecht stated that on the night of April 15, 2000, he, petitioner, and Patricia Ott went to the Sundowner Bar. (T. 408).  After they saw that Chris Tylutki was there, Kennerknecht and petitioner were discussing how Tylutki would "get away with a lot of stuff" and Kennerknecht stated to petitioner that "it looked like a good night for Jewish lightening." (T. 409).  Petitioner thought that it was "a good idea." (T. 409).  Kennerknecht explained that the term "Jewish lightening" referred to someone

5

setting a fire. (T. 410).  Kennerknecht stated that not only did petitioner think it was a good idea, he stated that "[s]he wanted me to go up and set the fire." (T. 412). Kennerknecht then left the Sundowner in petitioner's car, although he could not remember whether petitioner handed him the keys to the car or whether he already had the keys since he had driven the three to the bar earlier. (T. 413-14).

Kennerknecht then testified that he went to Tylutki's mobile home, knocked over a light, took a couple of boxes, and started a small fire in the livingroom with a lighter. (T. 415).  Kennerknecht stated that he walked out of the house, and went back to the Sundowner. *Id.*  When he got back to the Sundowner, petitioner asked him if he "did it," and Kennerknecht answered "yeah". (T. 416).  Kennerknecht, petitioner, and Patricia Ott stayed at the Sundowner for a little while longer and then Ott suggested that they go to another bar called Partners. (T. 416).  Kennerknecht stated that as they drove toward Partners, petitioner mentioned that she "thought she'd seen a red glow up towards Glen ... ." (T. 417).

They ultimately decided not to go into Partners when they arrived there, and Kennerknecht stated that petitioner wanted to go check on "the kids." (T. 417).  They drove by Tulutki's trailer on the way and there was nothing happening there. (T. 419). They arrived at petitioner's house, and petitioner sent Kennerknecht to check on Robby, who was not at her house, but about a quarter mile away. (T. 419).

6

Kennerknecht stated that he left, but never actually checked on Robby, but then returned to petitioner's house. (T. 420).  Kennerknecht stated that he, petitioner, and Ott left petitioner's house, went back to the Sundowner, stayed for a little while, and then left to take Ott home. (T. 420).

After they took Ott home, they brought Ott's babysitter home. (T. 421).  After they took the babysitter home, petitioner and Kennerknecht drove by Tulutki's trailer, and Kennerknecht testified that petitioner wanted Kennerknecht to go back and restart the fire, because petitioner would not be happy until "the place was burnt down." (T. 422).  Kennerknecht stated that petitioner was driving the car at the time and drove Kennerknecht back to Tylutki's. (T. 422).  Kennerknecht went back into Tylutki's trailer, crushed some more boxes, and restarted the fire in the same spot in the livingroom. (T. 422-23).  Kennerknecht then went to meet petitioner who had driven up the road and was waiting for him. (T. 423).  Then they "drove around for a little while waiting to see if it took." (T. 424).

As they were driving around, they saw James Squillace drop off Tylutki at the trailer. (T. 424).  Petitioner and Kennerknecht turned the car, and headed back toward Amsterdam, but then turned back and saw the glow at Tylutki's house. (T. 425).  They then drove to Tylutki's, and the trailer was almost completely engulfed in flames. (T. 426).  They pulled over and got out of the car. (T. 426).  Kennerknecht stated that

7

petitioner ran over to Tylutki, trying to comfort him, but that Kennerknecht was "just in awe that I had done this and this place was burning." (T. 426).  Although Kennerknecht left briefly to go tell petitioner's babysitter that they would be delayed, he returned to Tylutki's house, and he and petitioner stayed until the ambulance took Tylutki to the hospital. (T. 427).

During Kennerknecht's testimony, the prosecutor played an audio tape of Kennerknecht speaking with petitioner some time after the fire. (T. 428). Kennerknecht could not recall exactly when the conversation took place, but testified that it was after April 16, 2000 (the night of the fire). (T. 429).  Kennerknecht testified that the subject of the conversation was petitioner's visit to Tylutki. (T. 429). According to Kennerknecht, he and petitioner were suppose to go visit Tylutki after the fire, but petitioner went by herself. (T. 429).  A transcript of the tape recording was made and has been included in the respondent's exhibits. Respondent's Ex. N. Kennerknecht stated that he thought that petitioner made the recording. (T. 429). Kennerknecht then testified that petitioner played the tape for him and threatened to use it against him if he did not start another fire. (T. 434).  Kennerknecht then testified that he was in possession of the tape because he had stolen it from petitioner's dresser. (T. 434).

The defendant and the prosecution were given the opportunity to write in any

8

errors, deletions or additions that they believed should have been in the transcript prior to the jury being given copies of the transcript. (T. 391). The judge instructed the jury accordingly. (T. 436-37). The court also instructed the jurors that if they disagreed with the transcript or with what the parties had written in the margins (if anything), the jurors should make their own conclusions about what they heard on the tape. (T. 437-38).

On the tape, petitioner and Kennerknecht discuss the quality of their respective alibis, and although petitioner never actually admits being involved in the fire, twice, she did not deny making the "red glow" statement when Kennerknecht told her that she should not have mentioned the "red glow" when Patricia Ott was in the car. Petitioner's first response was that Patricia was not going to say anything, and her second response was that she no longer wished to discuss it.

Patricia Ott testified for the prosecution and stated that petitioner told Ott that Tylutki had raped petitioner when she was seventeen, and had grabbed petitioner's son by the throat. (T. 508). Ott stated that when she, petitioner, and Kennerknecht arrived at the Sundowner, petitioner began "antagonizing" Tylutki. (T. 509). Ott further stated that at approximately 11:00 p.m., she overheard a discussion between petitioner and Kennerknecht, in which petitioner asked Kennerknecht to go pick up some cigarettes for her. (T. 509-510). However, there was a cigarette machine in the

9

Sundowner and a convenience store "[r]ight in the parking lot" of the Sundowner. (T. 510). Ott stated that the convenience store was open at that time. (T. 510).

Ott stated that Kennerknecht left the Sundowner at approximately 11:00 p.m. and did not return until 12:00 a.m. (T. 511). Ott commented on how long it took to get the cigarettes, and petitioner stated that Kennerknecht had gone to Price Chopper and was probably talking to some people that he knew. (T. 511). Ott stated that she, petitioner, and Kennerknecht left the bar at approximately 12:30 a.m. because Ott had told her babysitter that she would be home by 1:00 a.m.

Ott stated that before taking her home, they stopped at another bar named Partners, but that no one was there, so they left to take Ott home. (T. 512). When they arrived at Ott's house, petitioner and Kennerknecht picked up Ott's babysitter to take her home. (T. 513). Ott stated that at approximately 9:00 a.m. on April 16, 2000, she received a telephone call from petitioner. (T. 513). During that call, petitioner stated that she and Kennerknecht had gone back to petitioner's house, where they heard on the "scanner" that Tylutki's house was on fire. (T. 513). Ott stated that petitioner told her that after they heard this, she and Kennerknecht went to Tylutki's house. (T. 513). Petitioner also told Ott not to be surprised if she received a telephone call from an investigator asking Ott questions about the fire. (T. 513). Petitioner then told Ott that she should tell the police that she had been with petitioner all night, and that petitioner

10

did not leave the bar all night, even to go to the bathroom. (T. 514).

James Squillace also testified for the prosecution.  He stated that after petitioner, Kennerknecht, and Ott arrived at the Sundowner, petitioner was "badgering" Tylutki about something, and that he and petitioner were arguing. (T. 541).  Squillace also testified that Kennerknecht left the bar for between one and one half hours. (T. 543).  He later took Tylutki home, and Squillace's sister-in-law called to tell him that Tylutki's trailer was on fire. (T. 545).

William VanDerveer, the Chief of the volunteer fire department testified that he was first on the scene of the Tylutki fire, and he saw petitioner there. (T. 557).  Petitioner approached VanDerveer and told him that Tylutki was hurt and needed help. (T. 557).  Israel Toro, an Investigator with the New York State Bureau of Criminal Investigations also testified for the prosecution. (T. 594).  He was involved in investigating the fire in this case. (T. 595).  On January 25, 2001, Investigator Toro and Investigator Robert Shufelt went to interview petitioner and asked her to come down to the State Police Barracks to continue the interview. (T. 595-97).  Investigator Toro stated that he had spoken to petitioner several times prior to January 25, 2001. (T. 595).

Petitioner and her three children went down to the police barracks. (T. 597).  After being read her *Miranda* warnings, petitioner ultimately gave a statement

11

regarding the Tylutki fire that Investigator Toro reduced to writing. (T. 599-600).

Petitioner's statement to Toro, which was admitted as evidence at trial, indicated that

she, Ott, and Kennerknecht had gone to the Sundowner, she had sent Kennerknecht

out at 11:30 p.m. to purchase cigarettes, he returned at approximately midnight, they

left the Sundowner at 1:30 a.m. and took Ott home. (T. 605).  Petitioner's statement

also indicates that she and Kennerknecht took Ott's babysitters home, and after

dropping them off, were heading west on Route 161 in the Town of Glen, when she

saw a glow in the sky. (T. 605).  She stated she later realized that it was Tylutki's

trailer, and that when she and Kennerknecht passed by Tylutki's trailer, he was in the

driveway, and that petitioner made Kennerknecht stop. (T. 605).

Petitioner then stated that she went over to help Tylutki, but that Kennerknecht

was unhappy because Tylutki had been flirting with petitioner in the bar. (T. 606).

Petitioner stated that two or three days later, she and Kennerknecht had a fight, and

that he threatened to burn her house down, just like he burned Tylutki's house down.

*Id.*  Although, petitioner ended her statement then, it appears that she added another

statement. (T. 606).  She stated that on the night of the fire, after they left the

Sundowner and went to petitioner's house to check on her children, Kennerknecht left

for about twenty minutes.  When he came back, they took Ott home.  As they drove

past Tylutki's home, petitioner stated that Kennerknecht made the comment that there

was "still nothing."  Petitioner stated that he then told her that he started the fire, and that he wished to return to make sure that he did not leave any evidence behind. (T. 606).  She stated that she dropped him off and took over driving.  She drove to Noeltener Road, turned around and went back to get Kennerknecht. (T. 606).

Petitioner stated that she did not see anything, but Kennerknecht told her that the house was "just charred." (T. 606).  They started to go back to petitioner's home, and Kennerknecht was driving.  He decided to go around the block and asked petitioner if she wanted to stop, but she stated that she wanted to go home.  They saw Squillace and a white car by the Millpoint Bridge, and when they got to Lewis, she noticed the fire, and Kennerknecht commented that it did "take." (T. 607).

Petitioner testified in her own defense, stating that she asked Kennerknecht to go out of the bar to get cigarettes because they were so expensive in the bar vending machine. (T. 643).  She stated that the discussion with Tylutki about his shirt was just the two of them "joking around." (T. 643).  She stated that she observed Tylutki and Kennerknecht go into the bathroom, and Ott went to ask the bouncer in the bar to follow them into the bathroom "because Steve was starting a fight." (T. 644).  She stated that Kennerknecht left the bar at approximately 11:15 p.m. and returned at midnight. (T. 643, 645).  Petitioner stated that Kennerknecht did return with cigarettes for petitioner. (T. 645).

13

Petitioner testified that after she, Kennerknecht, and Ott left the Sundowner, they went to Partners, but no one was there so they went back to petitioner's house, where Kennerknecht left them for fifteen or twenty minutes to go "change his shirt." (T. 647, 649).  Petitioner testified that it was not until they had dropped off Ott's babysitters and petitioner and Kennerknecht were driving alone that Kennerknecht stated that he had to "go back and do something." (T. 651).  Kennerknecht then stated that he had to go get "rid of all the evidence." (T. 651).  Petitioner stated that she did not know what he was talking about, and Kennerknecht told petitioner that he "started a fire at Chris Tylutki's house." (T. 651).

Petitioner then testified that she would not let Kennerknecht pull into Tylutki's driveway and told Kennerknecht that she did not want to "get wrapped up in what you did." (T. 652).  She testified that Kennerknecht then told her he was "only joking." (T. 652).  Petitioner stated that they began arguing, and Kennerknecht got out of the car and slammed the door. (T. 652).  Petitioner stated that she got into the driver's seat and started heading home, but then turned around and went to pick Kennerknecht up. (T. 652).  Petitioner stated that she picked Kennerknecht back up again, and let him drive.  They passed Tylutki's house, and petitioner stated that Kennerknecht commented that there was "still nothing." (T. 653).

Petitioner stated that they drove around even more, that Kennerknecht asked

14

petitioner if she wanted to "go parking", but that petitioner said no. (T. 653).

Petitioner stated that as they were driving back to her house, they passed Tylutki's

house and saw the fire. (T. 654). Petitioner stated that she told Kennerknecht to stop,

but that he refused, and she reached out and grabbed the steering wheel. (T. 654).

They did stop, petitioner stated that she got out of the car and went over to see if

Tylutki was alright. (T. 654). Petitioner testified that she called Patricia Ott the next

afternoon to tell her what had happened. (T. 656). Petitioner testified that Ott asked

her if the police were going to come asking questions, but that petitioner told Ott just

to say that she was with petitioner. (T. 657). Petitioner then detailed all the help that

she gave Tylutki after the fire. (T. 658-59).

Petitioner testified that Kennerknecht threatened that he would burn her house

down if she did not stay away from Tylutki, and that Kennerknecht did not even let

petitioner use her telephone alone. (T. 661). She stated that she was not allowed to go

to the store or to her mother's house by herself, and she was not allowed to have any

kind of a conversation with anybody unless Kennerknecht were there. (T. 661).

Petitioner testified that although petitioner had written letters to her husband, telling

him to "come home", Kennerknecht was not happy and told her that "if he couldn't

have [petitioner], nobody was going to have [her]." (T. 663).

Petitioner testified regarding the tape recording. (T. 677-78). She stated that

15

she recognized her voice, but that she did not record the tape. Instead, she stated that she was "told" that the tape was made by "Investigator Toro and his partner in a car." (T. 678). On cross-examination, petitioner admitted that the car driven by petitioner belonged to her mother, and that Kennerknecht was generally not allowed to drive the car alone without petitioner. (T. 681). Also on cross-examination, petitioner admitted that she had spoken to the police many times, but never until January of 2001 told them that Kennerknecht started the fire. (T. 688-90).

Petitioner's counsel called Bonnie Sprague to the stand to testify that once when Kennerknecht was at Sprague's house, he told her that if he could not have petitioner, no one would. (T. 698). Sprague also testified that Kennerknecht was always either around petitioner's house, on the road, standing in a ditch, or standing in the bushes. (T. 699-701). Finally, petitioner's son Robby Wood testified in petitioner's behalf. He was the individual who found the audio tape in the house in which Kennerknecht was living. (T. 724).

## 2.    **Exhaustion and Procedural Default**

The law is well-settled that prior to bringing a petition for habeas corpus pursuant to 28 U.S.C. § 2254, a petitioner must exhaust her state court remedies with respect to each claim presented in her federal application for habeas relief. *Baldwin v. Reese*, 541 U.S. 27 (2004). In order to exhaust her state court remedies, the petitioner

must "fairly present" her claims in each appropriate state court, alerting the court to the **federal nature** of the claim. *Id.* (quoting *Duncan v. Henry*, 513 U.S. 364, 36-66 (1995)). The petitioner must have informed the state court of **both** the factual **and** legal premises of the claims that she is attempting to bring in federal court. *Id.*

In order for petitioner to meet this requirement, it is not always necessary to specifically cite to the federal constitution, and the Second Circuit has held that there are a number of ways to alert the state court to the federal nature of the claim. *See Daye v. Attorney General*, 696 F.2d 186, 191-92 (2d Cir. 1982). In order to properly raise a federal claim in state court for purposes of exhaustion, the petitioner may (1) rely upon pertinent federal cases, employing federal constitutional analysis; (2) rely upon state court cases, employing federal constitutional analysis in factual situations like those of the petitioner; (3) assert the claim in terms so particular as to call to mind a specific right protected by the federal constitution; or (4) allege a pattern of facts that is "well within the mainstream of constitutional litigation." *Id.* at 194.

If petitioner has not exhausted her state court remedies, but no longer has remedies available in state court with regard to these claims they are "deemed" exhausted but are also procedurally defaulted. *Bossett v. Walker*, 41 F.3d 825 (2d Cir. 1994)(citing *Grey v. Hoke*, 933 F.2d 117, 120-121 (2d Cir. 1991)), *cert. denied*, 514 U.S. 1054 (1995). A state prisoner who has procedurally defaulted on a federal claim

in state court is entitled to federal habeas review of that claim only if she can show both cause for the default and actual prejudice resulting from the alleged violation of federal law, *Coleman v. Thompson*, 501 U.S. 722, 750 (1991), or establish that failure of the court to consider the claim will result in a miscarriage of justice. *Id.* at 748.  A miscarriage of justice will have occurred if the constitutional violation has "probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496 (1986). In this case respondent argues that petitioner's first, fourth, and fifth claims are both unexhausted and procedurally defaulted.

### A. Jury Instruction

Petitioner's first claim is that the trial court erred in failing to give a supplemental jury instruction explaining the difference between accessorial liability for the substantive crime and an accessory after the fact.  Petitioner argues that, based on the evidence at trial, at most she could have been responsible for aiding Mr. Kennerkenecht after he had set fires at the victim's mobile home.  Respondent argues that in petitioner's state court papers, she cited only state law in support of this argument, and cited no federal law or federal constitutional provisions.  In the habeas petition, petitioner's counsel argues that because the judge failed to give the requested instruction, the jury could have concluded that petitioner was guilty of being an accessory without sufficient evidence in violation of petitioner's Fourteenth

18

Amendment right to due process.  In the memorandum in support of her habeas petition, petitioner now cites federal case law and federal constitutional provisions in support of her argument.

It is true that in her appellate brief, petitioner argued the jury instruction issue based solely upon New York law, however, at the end of petitioner's argument, she stated

> [t]here is no basis upon which anyone can conclude with any reasonable degree of confidence, ***let alone to the level of proof beyond a reasonable doubt***, whether this jury determined that Ms. Wood was involved in the planning of the crime or whether the jury convicted her based on her actions after the crime occurred.

Respondent's Ex. E at 10 (Petitioner's Brief to the Appellate Division)(emphasis added).  It is arguable that petitioner was claiming that because of the trial judge's failure to give the requested instruction, it allowed the jury to convict petitioner of accessorial liability on less than proof beyond a reasonable doubt of the crime.  The Appellate Division decided that since the jury was instructed properly on all the elements of accessorial liability, the County Court properly denied the request for a supplemental charge. 299 A.D.2d at 740, 751 N.Y.S.2d at 108.

In *Jackson v. Edwards*, 404 F.3d 612, 621 (2d Cir. 1995), the Second Circuit held that a petitioner did not have to tell the state court that he was presenting a federal due process claim when by raising his state law claim, he necessarily gave the

state an opportunity to decide the federal claim.  This occurs where the state and

federal claims share the same standard, and in ruling on the state claim, the state court

"necessarily rejects the federal claim." *Id.* at 620.  The Supreme Court had expressly

left this question open when it decided *Baldwin v. Reese*, 541 U.S. 27 (2004). *See*

*Jackson*, 404 F.3d at 620-21.

Constitutional law is well-settled that a defendant must be convicted upon proof

of every element of the crime beyond a reasonable doubt.  *In re Winship*, 397 U.S.

358, 362 (1970).  Although it is also true that errors of state law in jury instructions

cannot form the basis for federal habeas relief,[1] petitioner in this case appears to have

claimed in her appellate brief that the error allowed the jury to convict her of

accessorial liability without proof beyond a reasonable doubt of all the elements of

that offense.  Petitioner also argued that the failure to give the supplemental

instruction deprived the jury of the legal principles relevant to the petitioner's defense

at trial. Respondent's Ex. E at 8.

On appeal to the New York Court of Appeals petitioner's argument was almost

identical, and argued that the instruction was "fine as a general matter", but that the

trial court failed to tailor the instruction to the petitioner's case and, therefore, only

"provided the law applicable to the prosecution's theory." Respondent's Ex. I at 9

---

[1] *Estelle v. McGuire*, 502 U.S. 62 (1991).

(Letter dated November 27, 2002).[2]  Once again, petitioner cited only New York case law and statutory law in support of her argument.  The last sentence of petitioner's argument states that "[i]t is not sufficient for the trial court to give a charge which only states the minimal requirements necessary to support a verdict of guilty." *Id.* at 10.

Petitioner's counsel cited *People v. Newman*, 46 N.Y.2d 126, 130, 412 N.Y.S.2d 860, 385 N.E.2d 598 (1978) in support of the jury instruction argument. *People v. Newman* involved a case in which the trial judge charged at the outset of the trial that the prosecution bore the burden of producing proof beyond a reasonable doubt, but refused to repeat the charge after the proof had been presented.  Thus, the jury in *Newman* was instructed as to the elements of the charges at the end of the case, but was not reminded that those elements had to be proved beyond a reasonable doubt. *Id.*  The court cited *In re Winship* in its analysis. 46 N.Y.2d at 128, 412 N.Y.S.2d at 861, 385 N.E.2d at 599.

Although it is not clear that *Newman* applied to petitioner's case, the mention of

---

[2] Respondent's Ex. I contains petitioner's application to appeal to the New York Court of Appeals.  It is noted that petitioner submitted three different letters containing legal arguments to the Court of Appeals, one dated November 27, 2002, one dated December 3, 2002, and one dated January 30, 2003.  The first two letters were signed by Attorney Phillip G. Steck, Esq. and the third was submitted by petitioner's present attorney, Richard L. Mott, Esq. who replaced Attorney Steck.  The court has examined all three submissions in determining whether petitioner exhausted her state court remedies.

reasonable doubt in her appellate brief, and the citation to *Newman* in her application

to the New York Court of Appeals could be interpreted as an attempt to raise the

federal claim that counsel now raises in the petition for habeas corpus, with many

citations to federal constitutional principles.  Petitioner's claim at the State Court level

that the jury was deprived of the legal principles with which to analyze her "defense"

also may be interpreted as raising the constitutional claim that criminal defendants are

entitled to a "meaningful opportunity to present a complete defense,"[3] a claim that

petitioner's habeas corpus application now specifically raises.

Thus, it is arguable that petitioner exhausted her claim of improper jury

instructions, and thus the court will consider the merits.  This court finds, however,

that whether petitioner exhausted this claim or not, it would have to be dismissed as

stated below.[4]

**B.  Accomplice Testimony**

Petitioner claims in her habeas petition that her right to a fair trial and her right

---

[3] *See Gilmore v. Taylor*, 508 U.S. 333, 343 (1993)(citing *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)).

[4] If petitioner were found to have failed to exhaust this claim, the court would not have considered the merits of the claim based on petitioner's procedural default, as explained above, since she can no longer return to state court to raise this claim.  New York law provides for only one application for direct review. N.Y. RULES OF COURT, COURT OF APPEALS, § 500.10(a).  Petitioner has already had her one application, the State courts considered the claim based on state law, and petitioner cannot now return to raise the federal claim based on the same facts.  Additionally, because she raised the claim on appeal, she cannot return to state court to file a collateral motion to vacate her conviction pursuant to N.Y. CRIM. PROC. LAW § 440.10(2)(a), (2)(c).

to be convicted of proof beyond a reasonable doubt were violated as the result of a jury instruction that permitted accomplice testimony to be corroborated solely upon petitioner's conduct as an accessory after-the-fact. Memorandum in Support of Habeas Petition at 11.

The court would first point out that petitioner's claim on appeal to the Appellate Division was only that the accomplice testimony was not sufficiently corroborated. It did not mention the court's jury instructions to that effect. Respondent's Ex. E at 13-17. The Appellate Division's decision discussed both the sufficiency of evidence in general (a claim that petitioner did exhaust) and petitioner's claim that the accomplice testimony was insufficiently corroborated in violation of N.Y. PENAL LAW § 60.22. 299 A.D.2d 741-42, 751 N.Y.S.2d at 109-110.

Petitioner's letters to the New York Court of Appeals in arguing the accomplice testimony claim, focused specifically on the alleged violation of the New York Penal Law and the alleged insufficiency of corroborating evidence. Respondent's Ex. I. *None* of the applications in State court mention a problem with the jury instruction on accomplice testimony. In fact, in Mr. Mott's letter to the New York Court of Appeals, he stated the proposition that the court had "justifiably warned in the past that accomplice testimony must be regarded 'with the utmost caution." Respondent's Ex. I (Letter of January 30, 2003 at 15). The letter then stated that the trial court "used

almost identical language in its jury instruction." *Id.*  Thus, the only claim made at the state court level was the insufficiency of the corroboration under section 60.22.

The fact that petitioner has changed the claim to one involving the jury instruction would be sufficient to find that the claim is unexhausted, however, even if the claim raised had been identical to that raised in state court, it would still be unexhausted.  Since petitioner argued only state law with respect to this claim, it would only be exhausted if the federal and state standards were identical as in *Jackson, supra*, or if the assertion of the claim immediately brought to mind a right protected by the federal constitution or was well within the "mainstream" of constitutional litigation as stated in *Daye, supra*.

Petitioner can meet none of the above standards for presenting a federal claim since "[i]n marked contrast to New York law, ... there is no federal constitutional requirement that accomplice witness testimony be independently corroborated." *See Spencer v. McCray*, 01 Civ. 8029, 2004 U.S. Dist. LEXIS 8707, *25-26 (S.D.N.Y. April 30, 2004)(citing *inter alia Caminetti v. United States*, 242 U.S. 470, 495 (1917); *Gaiter v. Lord*, 917 F. Supp. 145, 150 (E.D.N.Y. 1996)).  The court would point out that the District Court in *Spencer* had already held that the accomplice testimony claim was probably unexhausted, but considered the merits in the alternative. *Id.* at *18-20, 25-28.  Thus, simply arguing that the accomplice's testimony was not

24

sufficiently corroborated does *not* raise a federal constitutional claim in state court.

Petitioner in this case has, therefore, not exhausted either a claim that the jury instructions improperly allowed the jury to find corroboration based on petitioner's own conduct, nor did she exhaust a claim that the accomplice testimony was insufficiently corroborated in itself.

Since the accomplice testimony claim is unexhausted, the court must consider whether petitioner can return to state court or whether the claim can be "deemed" exhausted, but procedurally defaulted.  As stated above, petitioner cannot return to state court to raise a "federal" constitutional claim at this time because she has already had her one direct appeal attempt, and cannot now file a motion to vacate her conviction, either to raise a claim that she raised on appeal or to raise a claim that she should have, but did not raise on appeal.  Thus, petitioner has procedurally defaulted on the accomplice testimony claim.

Petitioner cites neither cause nor prejudice due to her failure to raise this claim as a constitutional claim in state court.  This court also finds, as more completely stated below, that petitioner cannot show a miscarriage of justice should the court fail to consider the merits of the claim.  As stated above, the accomplice testimony issue is simply *not a federal claim*.  Petitioner could, and did, raise the general claim that the evidence was insufficient to convict her, and the court will consider that claim on the

merits, but may not consider the separate claim that the accomplice testimony was not sufficiently corroborated.  Thus, petitioner's fourth claim may be dismissed.

## C.  Prosecutorial Misconduct

Petitioner's fifth claim is that the prosecutor's summation was inflammatory and deprived petitioner of her right to a fair trial.  On appeal to the Appellate Division, petitioner claimed, citing only New York State law, that because the proof in this case was so weak, the prosecutor's inflammatory comments were excessive and influenced the jury.  The Appellate Division found that in light of the trial judge's curative instruction and after a review of the entire summation, petitioner was not deprived of a "fair trial."  In the applications for leave to appeal to the Court of Appeals, counsel argued that the prosecutor's summation was nothing but an improper character attack on petitioner.

Although respondent argues that this claim is unexhausted, it has been held that a claim of prosecutorial misconduct on summation "is arguably within the mainstream of constitutional litigation." *Gonzalez v. Artuz*, 99 Civ. 12277, 2001 U.S. Dist. LEXIS 20807, *16-18 (S.D.N.Y. Dec. 12, 2001)(citing *inter alia Garofolo v. Coombe*, 804 F.2d 201, 206 (2d Cir. 1986)(holding that a claim of prosecutorial misconduct has sufficiently federal implications to come within the fourth prong of *Daye*)).  This is true regardless of whether petitioner has cited any federal statutes or case law.  The

petitioner in *Gonzalez* had failed to cite any federal case law, and the court still considered the prosecutorial misconduct claim exhausted and considered the claim on the merits. *Id.* Thus, this court finds that petitioner's prosecutorial misconduct claim has been exhausted and will proceed to consider the merits of that claim.

**4.   Standard of Review**

The standard of review in a habeas action depends upon whether the state court considered petitioner's constitutional claims "on the merits." The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) provides that a federal court lacks the power to grant a writ of habeas corpus under 28 U.S.C. § 2254 unless the state court ruling **on the merits** of a federal constitutional issue was either "'contrary to ... clearly established Federal law' or 'involved an unreasonable application ... of clearly established Federal law.'" *Noble v. Kelly*, 246 F.3d 93, 98 (2d Cir.)(quoting 28 U.S.C. § 2254(d)(1))(alterations in original), *cert. denied*, 534 U.S. 886 (2001). The statute further provides that the court may grant a writ of habeas corpus when a claim that was considered on the merits by the state court "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

Prior to the AEDPA, the court was not required to defer to state court determinations on pure questions of law and mixed questions of law and fact.

27

*Thompson v. Keohane*, 516 U.S. 99, 107-13 (1995).  When presented with these questions, the court was empowered to conduct an independent review of the record. *Id.*  The factual findings of the state court, however, were presumed to be correct absent circumstances listed in the statute, such as cases in which the factual finding was not fairly supported by the record.  28 U.S.C. § 2254(d) & (d)(8).  The AEDPA requires the court to apply a more deferential standard, placing new restrictions on the power of federal courts to grant writs of habeas corpus to state inmates. *Williams v. Taylor*, 529 U.S. 362, 399 (2000).

In order to apply the AEDPA standard, the petitioner's claim must have been "adjudicated on the merits" in the State court proceedings. 28 U.S.C. § 2254(d)(1). Additionally, the AEDPA provides that a state court's fact findings are presumed correct, unless that presumption is rebutted by clear and convincing evidence. *Id.* § 2254(e)(1).  If the State court has failed to adjudicate a claim "on the merits", the pre-AEDPA standard of review applies, and the court reviews both questions of law and mixed questions of law and fact *de novo. Washington v. Shriver*, 255 F.3d 45, 55 (2d Cir. 2001).

A state court's decision is contrary to federal law if it arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court on a set of materially

indistinguishable facts. *Williams v. Taylor*, 529 U.S. at 413.  A state court

unreasonably applies clearly established federal law when the correct principle is

identified, but the state court unreasonably applies that principle to the facts of the

petitioner's case. *Id.*

## 5.    **Jury Instructions**

There is no question that the Appellate Division decided petitioner's jury

instruction claim on the merits, and thus, the AEDPA standard applies.  The well-

settled Supreme Court precedent states that after identifying an error of state law in

the jury instructions, the court must determine whether the trial court's refusal to give

the instruction "so infected the entire trial that the resulting conviction violates due

process." *Jackson v. Edwards*, 404 F.3d at 624 (citing *Cupp v. Naughton*, 414 U.S.

141, 147 (1973)).

With respect to accessorial liability, the trial court charged the jury that:

> When one person engages in conduct which constitutes an offense,
> another is criminally liable for such conduct when, acting with a state of
> mind required for the commission of that offense, she solicits, requests,
> commands, importunes or intentionally aides [sic] such person to engage
> in such conduct ... . In this case, in order for the defendant to be held
> criminally liable for the conduct of another, you must find beyond a
> reasonable doubt that she acted with a state of mind required for the
> commission of the crime and that she solicited, requested, commanded,
> importuned or intentionally aided another person to engage in that crime.

Trial Transcript (T) at 858-59.  Petitioner does not argue that this instruction is

incorrect, rather, she argues that the court should have given a supplemental charge

explaining the difference between accessorial liability and an accessory after-the-fact.

Petitioner requested the following supplemental charge:

> A defendant who does not share another person's intention to commit a crime, but who nevertheless assists that person after the commission of the crime is not liable for the conduct of such person. Such defendant is said to be an accessory after the fact only. An example of someone who is an accessory after the fact is someone who takes another away from the scene of a crime with knowledge that a crime has been committed. An Accessory after the fact is not liable for another person's criminal conduct.

(T. 770-71). Instead of giving the supplemental charge requested by petitioner, the

court further advised the jury that "mere presence at the scene of the crime, even with

knowledge that the crime is taking place, or mere association with the perpetrator of a

crime, does not by itself make a defendant criminally liable for that crime." (T. 859).

The court then specifically repeated that in order for the defendant to be "held

criminally liable for the conduct of another, [the jury] must find ***beyond a reasonable***

***doubt that she acted with the state of mind required for commission of the crime***

***and*** that she solicited, requested, commanded, importuned or intentionally aided

another person to engage in that crime. (T. 859)(emphasis added).

The court also reemphasized that ***the People had the burden of proof beyond a***

***reasonable doubt*** that "the defendant acted with a state of mind required for the

30

commission of the crime and either personally or by acting in concert with another person committed each of the remaining elements of the crime." (T. 860). The court then explained each of the elements of burglary, arson, assault, and criminal mischief. (T. 861-70).

The petitioner was not charged with being an accessory after-the-fact. A review of the court's charge shows that the judge made it clear that in order to find petitioner guilty under the theory of accessorial liability, the People had to prove beyond a reasonable doubt that petitioner acted ***with the intent required for commission of the crime*** and that she solicited or intentionally aided that other person ***to engage*** in that crime.

Although petitioner argues that with the above instructions, the jury could have found petitioner guilty of the accessorial liability even if she only helped the accomplice "cover up" the crime, that assertion is unsupported. The trial court specifically stated that the petitioner's presence at the scene alone "even with the knowledge that the crime is taking place" was insufficient to find her guilty of the crime itself. Therefore, if the jury found that petitioner only helped the actual perpetrator cover up the crime or was even at the scene of the crime with the perpetrator, that alone was insufficient for a guilty finding. The court basically included the information requested by the defense without confusing the jury with the

concept of accessory after-the-fact which was not a charged crime, and not even a lesser included offense to the crime with which petitioner was charged. If the jury had actually found that petitioner was only responsible for covering up the crime or assisting the perpetrator after the crime, the jury would have acquitted petitioner.

Thus, the Appellate Division did not act contrary to or unreasonably apply Supreme Court precedent in rejecting petitioner's jury instruction claim since there was no error in the court's instruction in the first instance, and the jury was instructed properly on the elements of accessorial liability. Thus, petitioner's jury instruction claim may be dismissed.

## 6.   <u>Admission of Audio Tape</u>

At trial, the judge allowed the admission of an audio tape containing a conversation between petitioner and Mr. Kennerknecht, discussing the fire started by Mr. Kennerknecht. Petitioner objected to the admission of the tape because no one admitted making the recording, and counsel argued that admission of the audio tape would be a violation of the right to privacy since there was no evidence that one of the participants consented to the recording. The Appellate Division decided the issue on the merits, citing both federal and state principles. 299 A.D.2d at 740-41, 751 N.Y.S.2d at 108-109.

The Appellate Division upheld the trial court's finding that there was sufficient

evidence to show that the defendant made the audio tape and therefore provided the requisite consent.  The Appellate Division's decision was clearly on the merits, thus, the AEDPA standard applies.

Claims based on violations of state law are not generally cognizable on federal habeas review.  *Estelle v. McGuire*, 502 U.S. 62, 67 (1991)(citing *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990))(additional citation omitted); *Hameed v. Jones*, 750 F.2d 154, 160 (2d Cir. 1984), *cert. denied*, 471 U.S. 1136 (1985).  It is not the province of a federal habeas court to re-examine state court rulings on evidentiary issues. *See Estelle v. McGuire*, 502 U.S. at 67 (1991); *Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir.), *cert. denied*, 525 U.S. 840 (1998).  A writ may issue only in situations where an evidentiary ruling has rendered a trial fundamentally unfair. *Dunnigan v. Keane*, 137 F.3d at 125; *Taylor v. Curry*, 708 F.2d 886, 891 (2d Cir.); *cert. denied* 464 U.S. 1000 (1983).

The erroneous ***admission*** of unfairly prejudicial evidence will constitute a denial of due process only if the evidence is "sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." *Dunnigan v.* Keane, 137 F.3d at 125 (quoting *Johnson v. Ross*, 955 F.2d 178, 181 (2d Cir. 1992)(internal quotation marks omitted).  In short, the evidence must have been crucial, critical or highly significant.  *Collins v. Scully*, 755 F.2d 16, 19 (2d

Cir. 1985).

In this case, petitioner's memorandum focuses on the prejudicial effect of the trial court's ruling on the admission of the audio tape.  There are no cases cited for the proposition that the ruling was incorrect in the first place.  The Appellate Division's decision found that the admission of the tape was not erroneous either under state or federal principles.  Thus, this court must apply the AEDPA standard to the Appellate Division's finding.

The Fourth Amendment does not prohibit the use of recorded conversations where one party to the conversation consents to the monitoring. *United States v. White*, 401 U.S. 745 (1971), *cited in United States v. Workman*, 80 F.3d 688, 694 (2d Cir. 1996).  In its decision, the Appellate Division stated the identical proposition. 299 A.D.2d at 740-41, 751 N.Y.S.2d at 108 (citations omitted).  The court then found that, regardless of the fact that both parties denied making the audio tape, the evidence presented at trial was sufficient to show that petitioner herself recorded the conversation, providing the necessary consent. 299 A.D.2d at 741, 751 N.Y.S.2d at 109.

This court finds that the Appellate Division's factual finding was not "an unreasonable determination of the facts in light of the evidence" presented at the state court trial.  Both petitioner and Kennerknecht acknowledged that their voices were on

34

the tape recording. (T. 428-29, 431, 455, 677, 690).  The prosecutor asked petitioner whether there was any doubt that the two voices on the tape were petitioner's and Kennerknecht's. (T. 690).  Petitioner responded that there was no doubt. *Id.*

The transcript of the recording has been included as Respondent's Exhibit N.  It is reasonable to infer from the transcript that petitioner and Kennerknecht are in a car **alone**, since there is a discussion about watching for deer, slowing down, making a "left turn", and guard rails. Respondent's Ex. N at 2, 4, and 5.  At one point, Kennerknecht asks petitioner whether she is recording him. *Id.* at 5.  Petitioner then says that she is not recording, but accuses Kennerknecht of "probably recording" her.[5] *Id.*  Kennerknecht testified that petitioner played the tape for him in order to induce him to start another unrelated fire, and that the tape was in his possession because he took the tape recording and the tape recorder from the petitioner's dresser. (T. 434). Finally, at the *Huntley*[6] hearing prior to the trial, Investigator Toro testified that

---

[5] Next to the typewritten transcript is a handwritten addition.  At trial, the court allowed both parties to listen to the tape recording and write additions, deletions, or changes that they believed were appropriate.  When Kennerknecht asks petitioner whether she is recording him, the typewritten response by petitioner is "No, you're probably recording me." Respondent's Ex. N at 5.  However, next to the typewritten response is a handwritten response that simply asks, "Are you recording me?" *Id.*  Kennerknecht then asks petitioner "What am I going to record you with." *Id.*  Regardless of which response was actually on the tape, it is reasonable to conclude that one of the two was recording the other.

[6] *People v. Huntley*, 15 N.Y.2d 72, 78, 255 N.Y.S.2d 838, 204 N.E.2d 179 (1965).  A *Huntley* hearing challenges the admissibility of a defendant's statement.  In this case, the *Huntley* hearing was held to challenge the admissibility of petitioner's written statement to police.  However, there was discussion of tape recording during the hearing because the investigator played the tape for petitioner

petitioner told him that petitioner and Kennerknecht did not trust each other and would ***constantly*** record their conversations with each other. Huntley Hearing Transcript (HT) at 59.

A review of the transcript of the tape recording shows that either petitioner or Kennerknecht made the tape recording in question.  There is certainly no indication that any third party was in the car during the conversation.  Thus, the court was justified in finding that defendant recorded the tape, particularly since it was the petitioner who owned the tape recorder.  Once the court found that at least one party consented to the recording, the constitutional issue is resolved.  New York State law is identical in this respect. *See People v. McGee*, 49 N.Y.2d 48, 59, 399 N.E.2d 1177, 1182-83, 424 N.Y.S.2d 157, 163 (1979).  Thus, there was no error in the admission of the tape recording, and the Appellate Division's decision is neither contrary to nor an unreasonable application of Supreme Court precedent, nor is the Appellate Division's decision based on an unreasonable determination of the facts.  The petitioner's claim that the audio tape was improperly admitted may be dismissed.

**7.    Sufficiency of Evidence**

Petitioner argues that the evidence was insufficient to convict her.  The

---

during the time that he was interviewing her.  Thus, the discussion of the tape recording was also related to the statement that she made to the police.

36

Appellate Division clearly decided this issue on the merits, and thus, the AEDPA standard applies.  The petitioner has a heavy burden in a *legal sufficiency* of evidence claim. *Vera v. Hanslmaier*, 928 F. Supp. 278, 284 (S.D.N.Y. 1996).  The well-established Supreme Court precedent provides that a court must determine whether any rational trier of fact would have found the essential elements of the crime beyond a reasonable doubt. *Id.* (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1970)).  The evidence must be viewed in the *light most favorable to the prosecution*. *Id.*

Issues of credibility are for the jury to resolve. *Vera v. Hanslmaier*, 928 F. Supp. at 284 (citation omitted).  Under federal standards, a conviction may also be based on circumstantial evidence "so long as, from inferences reasonably drawn, the jury could fairly have found beyond a reasonable doubt that the defendant engaged in the charged criminal conduct." *United States v. Sureff*, 15 F.3d 225, 229 (2d Cir. 1994).

Under New York law, a defendant may not be convicted of a criminal offense upon the testimony of an accomplice, unless that testimony is supported by sufficient corroborative evidence to connect the defendant with the commission of the alleged offense. N.Y. CRIM. PROC. LAW § 60.22(1).  This corroborative evidence requirement is purely a matter of *state law* and is not constitutionally mandated.  *See Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)(habeas relief does not lie for errors of state law).

In this case, the fact that Mr. Kennerknecht was an accomplice does not prevent the court from reliance upon his testimony in deciding the constitutional sufficiency of evidence.  His credibility was a matter for the jury to decide.  Kennernecht testified that although at the bar, he initially stated that it would be a good night for "Jewish Lightening", it was the petitioner's idea that Kennernecht actually go and attempt to burn the victim's trailer. (T. 409-412).  Kennerknecht purportedly left the bar for more than one hour to purchase petitioner some cigarettes even though there was a cigarette machine in the bar and a convenience store across the street from the bar.  Petitioner testified that the reason that Kennerknecht left the bar to purchase cigarettes was because the cigarette machine was very expensive, and the convenience store closed at 11:00p.m. (T. 643).

Additionally, when the petitioner and Kennernecht drove by the victim's trailer later, it was petitioner's idea for Kennernecht to return to the trailer to light the second fire that actually destroyed the dwelling and injured the victim when he attempted to open the door.  Kennernecht testified that petitioner stated that she would not be happy until the place burned down. (T. 422).

Although petitioner argues that she only knew about the fire after Kennernecht had set it and at worst, helped him "cover up" the arson, the tape recording does not support her defense.  A review of the conversation shows that petitioner was relating a

38

conversation that she had with Mr. Tylutki when she went to see him after the fire.

Respondent's Ex. N.  It appears from the discussion that Mr. Tylutki was beginning to

think that petitioner and Mr. Kennerknecht were responsible for the arson even though

petitioner was attempting to help Tylutki recover from the fire.  Petitioner began

telling Kennerknecht how she responded to Tylutki's accusations.

Kennerknecht asked petitioner whether she had ever said anything to Patty Ott

about the "red glow" that *petitioner* saw, and petitioner told Kennerknecht that Patty

"ain't gonna say anything."  Then petitioner stated that she told Tylutki that if he

wanted to blame petitioner, "go ahead.  I have an alibi." *Id.* at 1.  Kennerknecht also

stated that "You just had to drop me off that second time, didn't you.  After the first

time, it was just lightly burned and that's it." *Id.* at 2.  Petitioner stated that the police

would be knocking on the door looking for she and Kennerknecht for something with

which they were not involved, and Kennerknecht responds "So what?  We had a

perfect alibi." *Id.* at 4.  Petitioner stated that "I still have a good alibi." *Id.*

Petitioner then stated that Tylutki probably wanted petitioner's son to drop the

charges against Tylutki, and Kennerknecht finished the thought, adding that if

petitioner's son did not drop the charges against Tylutki, he would "try to get [them]

for the fire."  Petitioner stated that Tylutki should go ahead and "try it", but that she

knew where she had been on the night in question and Kennerknecht knew where he

had been, and that Tylutki's threats would not work. *Id.* at 5.  Kennerknecht then again stated that petitioner should not have mentioned to Patricia Ott that petitioner saw a "red glow." *Id.*  Petitioner then responded that she did not want to talk about it any more. *Id.*  This is when the two discussed whether one was recording the other.

Although petitioner never admitted during this conversation that she was responsible for convincing Kennerknecht to start the fires, the tone of the conversation certainly indicates that petitioner was doing much more than just helping Kennerknecht after-the-fact.  If petitioner had not really been involved in the arson, she would have responded differently when Kennerknecht stated that petitioner "just had to" drop him off the second time, and that the first time, the fire had just lightly burned the area.  Petitioner's response to this statement was to tell Kennerknecht to watch out for deer. *Id.* at 2.  This comment certainly made it sound as if it had been petitioner's idea for Kennerknecht to return to the trailer and finish burning it down.

The references to the "red glow" and to Patricia Ott also support the prosecution's theory that petitioner was more than just helping Kennernecht cover up his crime.  On direct examination, Kennerknecht testified that when he, petitioner, and Patricia Ott left the Sundowner bar, petitioner commented that she saw a "red glow" toward Glen. (T. 417).  Petitioner could never have seen any "red glow" at that time because the second fire had not yet been set, and the first fire did not burn the trailer.

If this statement were made, petitioner must have been joking about the fire that she knew Kennerknecht had set.  Although Patricia Ott never testified that she heard this statement, it is clear that this was the same "red glow" to which Kennerknecht was referring during the taped conversation with petitioner.  During the taped conversation, petitioner never denied making that statement, instead she immediately stated that she no longer wished to discuss the crime.[7]

In addition to Kennerknecht's testimony and the audio tape itself, Patricia Ott's testimony also corroborated the prosecution's version of the events.  She testified that although there was a cigarette machine in the bar, Kennerknecht left the bar, and when he returned over an hour later, Ott did not see him give petitioner any cigarettes.  (T. 745).  This corroborates the theory that petitioner knew why Kennerknecht left the bar, and that petitioner had not asked him to get her cigarettes, but rather was well aware that Kennerknecht was going to try to set fire to Tylutki's trailer.  Kennerknecht used petitioner's car to accomplish the crime.  This supports the jury's finding that petitioner had the requisite intent to commit the crimes, and in fact, aided Kennerknecht in seeing that the crimes were completed.

---

[7] Although petitioner claimed that those statements were not on the tape, the members of the jury were allowed to hear the tape for themselves and decide what they heard on the tape.  Thus, in the light most favorable to the prosecution, the jury could reasonably have believed that petitioner stated that she no longer wanted to discuss the issue.

There is no question that Kennerknecht had the intent to commit the crimes.  He pled guilty and received a beneficial sentencing agreement.  In order for the jury to find that petitioner was guilty as an accomplice, they had to find that she had the requisite intent to commit each of the elements of the charged crimes, and that she solicited, requested, commanded, importuned, or intentionally aided the individual who actually committed the acts.  Based on the above, this court finds that the Appellate Division did not act contrary to or unreasonably apply Supreme Court precedent when the court found that there was legally sufficient evidence to find petitioner guilty as an accomplice.

## 8.    **Prosecutorial Misconduct**

Petitioner claims that the prosecutor's comments on summation were so inflammatory that the jury could have convicted petitioner because she was a "bad person" and not because the evidence proved her guilt beyond a reasonable doubt.  Petitioner's Memorandum of Law at 14-16 (Dkt. No. 2).  Petitioner first claims that the prosecutor depicted petitioner as a bad person because she had a bad boyfriend who was a convicted felon and had committed two arsons.  Second, petitioner claims that he attacked petitioner's character by stating that although she was still married at the time, she dated Kennerknecht, a dangerous and bad man.  Third, petitioner claims that the prosecutor referred to petitioner as a "shrill shrew" and implied that the

individual that the jury heard on the audio tape was the "real" Kathy Wood.

Petitioner also claims that the prosecutor characterized her as a "liar" and improperly utilized petitioner's failure to come forward with information regarding Kennerknecht's involvement when petitioner had several opportunities to do so. Finally, petitioner claims that the prosecutor implied that petitioner had a duty to speak with the police when they came to investigate the arson, notwithstanding a prior ruling that the prosecution could not use petitioner's pre-arrest silence against her.

The Appellate Division decided petitioner's claim on the merits, and thus, the AEDPA standard applies. The Appellate Division found that in light of the curative instructions given by the trial court, and viewed in the context of the entire summation, the prosecutor's comments did not deprive petitioner of a fair trial.

A federal court's review of a prosecutor's action on habeas corpus is very limited. Petitioner must prove that she suffered ***actual prejudice*** such that the prosecutor's misconduct "had a substantial and injurious effect or influence in determining the jury's verdict." *Bentley v. Scully*, 41 F.3d 818, 824 (2d Cir. 1994), *cert. denied*, 516 U.S. 1152 (1996); *see also Brecht v. Abrahamson*, 507 U.S. 619, 637 (1992). In evaluating whether petitioner has met her burden, three factors are relevant: (1) the severity of the prosecutorial misconduct; (2) any curative measures adopted to cure the misconduct; and (3) the certainty of conviction absent the

misconduct.  *See id.*; *Tankleff v. Senkowski*, 135 F.3d 235, 252 (2d Cir. 1998).

A review of both the closing arguments in this case shows that the prosecutor's comments did not deprive petitioner of a fair trial.  The petitioner testified in this case, and the prosecutor was entitled to attempt to attack her testimony the way her attorney attacked the testimony of petitioner's accomplice.  Petitioner's counsel began his closing discussing what a bizarre and dangerous person Mr. Kennerknecht was and how the petitioner tried her best to get away from him, but that he controlled her. (T. 775-76, 784-87).  Then defense counsel asked the jurors to ***compare*** the testimony of Kennerknecht and petitioner and to note that petitioner's testimony had none of the bad characteristics of Kennerknecht's testimony. (T. 794).  Petitioner's counsel stated that petitioner certainly did not exercise "sensible judgment" in dating Mr. Kennerknecht. (T. 799).

The court would first note that in making the determination of whether the prosecutor engaged in misconduct, the court may consider whether the prosecutor's remarks are made in response to defense counsel's remarks. *See Walker v. Bennett*, 262 F. Supp. 2d 25, 35 (W.D.N.Y. 2003).  Basically, defense counsel implied that Mr. Kennerknecht was lying and that it was "absurd" for the jury to believe that Kennerknecht had been compelled to act "by this devil." (T. 780).  Since defense counsel also asked the jury to ***compare*** the testimony of Kennerknecht with

44

petitioner's after stating that counsel did not see "those type of characteristics in the testimony of Kathy Wood." (T. 794).  Defense counsel had just finished stating that Mr. Kennerknecht's demeanor included not being able to look people in the eye, his testimony was "all over the place," and he could not "say anything honestly," and that his testimony was "nonsensical." (T. 792).

The prosecutor pointed out that as bizarre a man as Kennerknecht was, he was still petitioner's boyfriend, an individual whom she was seeing while still married. (T. 803-804).  Defense counsel objected, and although the judge overruled the objection, he admonished the jury that the attorneys' comments were not evidence, but that counsel could ask the jurors to draw inferences and conclusions from the evidence. Then the prosecutor pointed out that although petitioner looked soft spoken and had her hair done nicely when testifying in the courtroom, the jury should listen to the audio tape because that was the "real" Kathy Wood, the "shrill shrew", where "every other word practically begins with the letter F." (T. 804-805).

Again, defense counsel objected, and the judge again told the jurors that they would have to draw their own conclusions. *Id.*  However, it was ***defense counsel*** who told the jurors to ***compare the testimony*** of Kennerknecht and petitioner.  The prosecutor was justified in reminding the jury that petitioner's attitude and language on the audio tape was quite different than her "soft spoken" behavior at trial.  Thus,

45

while the jury was comparing testimony at petitioner's counsel's request, it was only

fair to compare petitioner's behavior on a tape in which there is no question that

petitioner was speaking.  In light of the petitioner's counsel's comments, it was fair

comment for the prosecutor to argue that the petitioner's true personality was not what

the jurors saw on the witness stand.

The prosecutor did mention once that petitioner had "exposed herself as a liar."

(T. 826).  The defense counsel objected, and the court instructed the jury immediately

that "disparagement" was not permissible, but that the attorneys could ask the jurors to

draw inferences based on the evidence. (T. 826-27).  Defense counsel spent most of

his closing disparaging the credibility and character of the prosecution's main witness,

calling him a bizarre and dangerous individual who was simply trying to "take

[petitioner] down" with him, (T. 787), who was a stalker, and who was completely

unworthy of belief.  (T. 774-75, 780, 794).

Finally, petitioner argues that the prosecutor's summation had the effect of

commenting on petitioner's pre-arrest silence because the prosecutor criticized

petitioner for failing to come forward with information about Kennerknecht when she

had the opportunity to do so and implied that she had a duty to do so.  However,

defense counsel stated during his closing that Kennerknecht had threatened petitioner

if she did not help him (T. 786-87) and that petitioner was trying to "get rid of"

Kennerknecht because he was stalking her, threatening her, stealing from her, and threatening to take her down with him because no one could have her but him. (T. 787-88).

What the prosecutor stated was that if petitioner was really trying to get rid of Kennerknecht, why did she not turn him in when she had the opportunity to speak to the police. (T. 820).  Although she testified that Kennerknecht was always around so that she did not tell the police about the fire for several months, the prosecutor was pointing out that this was not the case, and that she had many opportunities to tell the police about the fire when Kennerknecht was not around. (T. 820-21).  Once again, the prosecutor was commenting on the arguments made by defense counsel.

Thus, this court finds that the prosecutor did not commit misconduct on summation in view of defense counsel's summation.  Additionally, as stated by the Appellate Division, when defense counsel objected that the prosecution's comments were improper, even though the judge overruled the objections, he admonished the members of the jury that they were to draw their own conclusions and that disparagement was not proper.  Since there was no misconduct, the factor regarding "severity of the misconduct" need not be considered, and if the one reference to petitioner exposing herself to be a liar could be regarded as "misconduct", the severity of this conduct was very slight.  The judge's instructions to the jury cured any small

error in the prosecutor's summation.

The Appellate Division did not act contrary to or unreasonably apply Supreme Court precedent in making its decision, therefore, petitioner's prosecutorial misconduct claim may be dismissed.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that the petition be **DENIED and DISMISSED.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.**

*Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993)(citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: July 18, 2005

_____
Hon. Gustave J. DiBianco
U.S. Magistrate Judge

48